VELMA HIGHTOWER *et al.*, Indiv., and on behalf of their children, *et al.*, Plaintiffs-Appellants, v. EDWARD DUFFY, Director of Illinois Department of Public Aid, *et al.*, Defendants-Appellees.

First District (6th Division)   Nos. 1—87—3399, 1—88—2949 cons.

Opinion filed December 1, 1989.

Legal Assistance Foundation, of Chicago (John M. Bouman, Robert E. Lehrer, and Margaret Stapleton, of counsel), for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Karen Konieczny, Assistant Attorney General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

Two groups of plaintiffs, the Hightowers and Toneys, appeal from an order of Judge Roger J. Kiley dismissing their complaint (*Hightower* complaint); and another group of plaintiffs, the Clarks, appeal

from an order of Judge Kenneth L. Gillis dismissing their complaint (*Clark* complaint). The appeals have been consolidated because they have some issues in common. They concern the rights of public assistance recipients. The principal contention in both complaints was that a plan adopted by the Illinois Department of Public Aid (Department) violates an Illinois statute and the Social Security Act. In only the *Clark* case was the contention decided on the merits. The *Hightower* case was dismissed on a procedural ground.

## BACKGROUND

The Social Security Act established a Federal-State public assistance program for families with dependent children (AFDC Program). (42 U.S.C. §601 *et seq.* (1982).) The Program is based essentially on a scheme of cooperative federalism. The Federal government finances the Program on a matching fund basis. States are not required to participate in the Program. However, those who choose to take advantage of substantial Federal funds available for aid must comply with certain Federal rules and regulations.

Illinois has chosen to participate in the AFDC Program. (Ill. Rev. Stat. 1985, ch. 23, par. 4—1 *et seq.*) The legislature created several programs of assistance which offer various types of assistance to different groups of people. The Aid to Families with Dependent Children (AFDC) and General Assistance (GA) programs are two such programs. The GA program, which is funded solely by the State, provides cash assistance and other services, including limited medical coverage, to families with children who do not qualify for the AFDC program. (Ill. Rev. Stat. 1987, ch. 23, par. 6—1 *et seq.*) The Department administers both the AFDC and the GA programs. (Ill. Rev. Stat. 1987, ch. 23, par. 12—1 *et seq.*) In the City of Chicago, the Department administers the GA program, and the State funds 100% of the program. Outside Chicago, local counties or townships administer the GA program; and joint State and local efforts or entirely local efforts fund the program.

Two basic factors account for the amount of financial assistance provided to any eligible AFDC or GA family. The first factor is the "standard of need," which is the minimum level determined by computing the cost of items considered necessary for subsistence. The second factor is the "aid payment" itself, which is the actual amount of financial assistance provided.

Before October 1, 1973, the standard of need and grant levels for AFDC families was determined generally on a case-by-case basis. The standard of need for each family was determined by totalling the sum

of specified basic needs considered necessary for all recipients (*i.e*, food, shelter, personal essentials, clothing) and a number of variable special needs under certain circumstances (*e.g.*, special diets for diabetics).

As of October 1, 1973, Federal law and Illinois law permitted Illinois to "consolidate" its AFDC standard of need and grant structure. This consolidation resulted in averaging some or all of the sums representing the individually determined needs into the standard of need for all AFDC families. Consequently, the Department instituted the Illinois Consolidated Standard Plan, effective October 1, 1973, which sought to consolidate the AFDC standard and grant structure in accordance with Federal and State law.

As implemented, the consolidated standard of need for AFDC families varied by only three factors: the size of the family, the composition of the family (adult caretaker and child or child only), and the family's county of residence. The State was divided into three county groups: Group I included Cook County and other more populous counties; Group II included less populous counties; and Group III included rural, relatively sparsely populated counties. Under such consolidation, all families of the same size, composition, and residence (with no other countable income) were computed to have the same standard of need and received the same grant. Generally, the amount of an eligible family's grant depended upon a basic payment level for that family minus the amount of the family's countable income (countable for public assistance purposes, such as Social Security benefits). Although neither Federal nor State law required it, the Department paid eligible families 100% of their applicable standard of need. By 1978, the Department had fully adopted the same consolidated standard for families in the State-funded GA program as well.

In October 1981 the Department changed the formula for its AFDC and GA family standards. However, rather than consolidate its existing standards as it did in 1973, the Department utilized an entirely different statistical base and adjusted the family standards of need significantly upwards; but the percentages paid were no longer 100%.

Aid payments continued to vary by the same three factors that were decisive in the previous program's standards: family size, composition, and county of residence. Although the Department's change in formula adjusted family standards of need significantly upward, aid payment levels remained the same. This meant that aid payments for any family became less than or only a percentage of the new higher standard of need for that family. Under this change, the Department

paid eligible families of different sizes unequal percentages of the applicable standard of need. For example, the Department granted a four-person (adult and children) family in Cook County (Group I) benefits equalling 62% of its standard (Payment Level = $368; Standard of Need = $593), whereas it granted a two-person (adult and child) family in Cook County benefits equalling approximately 75% of its standard (Payment Level = $250; Standard of Need = $332). The Department granted a four-person (children only) family in Group II benefits equalling 62.2% of its standard (Payment Level = $275; Standard of Need = $442), whereas it granted a two-person (adult and child) family in Group II benefits equalling approximately 72.3% of its standard (Payment Level = $236; Standard of Need = $326). Officials of the Federal Department of Health and Human Services criticized the lack of uniformity in the Illinois payment system.

Beginning in 1981, the Department adjusted upward both AFDC and GA standards and aid payments for families in accordance with cost of living increases. In addition, the Department allocated these upward adjustments to families in a manner designed to ensure that all families would ultimately be paid equal percentages of their standard of need. As a result, families being paid a lower percentage of their standard of need generally received higher upward grant adjustments than families being paid a higher percentage of their standard of need.

In 1984 the legislature expressly recognized rising energy costs and directed that "[d]uring the first month" that the Department paid grants, which included amounts for energy payments, the amounts of the grants were to "be adjusted to approach more closely a single percentage of the standard of assistance established" by the Department. (Ill. Rev. Stat. 1985, ch. 23, par. 12—4.11.) The next paragraph of that section of the Act was amended to add an additional basis for reduction of payments: "[To] accomplish the adjustment described in the preceding paragraph."

In January 1985 the Department provided a grant increase and simultaneously equalized the percentage of standards for family sizes one through six in Group I and II counties and family sizes one through eight in Group III counties, which represented over 98% of the family case load. This left only larger-sized families and child-only families to be equalized, which, by the Department's estimate, consisted of between 4,000 and 5,000 families.

In May 1986 the Department of Health and Human Services again criticized the Department's plan because of a perceived lack of uniformity and "threatened to declare Illinois in non-compliance with

federal law." On January 1, 1987, in response to that criticism, the Department promulgated a rule which established, in effect, two levels for payments: one for those "assistance units" in existence before January 1, 1987, and the other for "assistance units" which would come into existence after January 1. Those in existence before January 1 were to be "grandfathered," that is, were to remain in effect at higher levels than those which would come into existence after January 1. The rule also provided that grandfathered status would be lost by a change in the assistance unit by an addition or deletion of an "assistance unit member" or "if the grandfather case is cancelled," for example, by a family going off assistance altogether.

THE PARTIES

The plaintiffs, Velma and Melvin Hightower and their seven children, had been receiving $649 per month in public assistance since 1986. On February 13, 1987, Velma gave birth to her eighth child. Based on her report that her family had increased, the Department notified her that she had lost her grandfathered status by an increase in her family and reduced her family's payments to $623 per month. The Department upheld the decision to reduce the family's monthly benefits and denied her internal administrative appeal.

The plaintiffs, Linda Toney and her eight minor children, first applied for assistance after January 1, 1987, and, therefore, did not have grandfathered status. She received $167 per month. (She had other countable income.) If she had applied before January 1, she would have received $225 per month. She also filed an administrative appeal; while the appeal was pending, she gave birth to her ninth child. Her award was increased to $199. She claimed that the family should receive the pre-January 1987 amount of $276. On June 25, 1987, after an administrative hearing, the Department upheld the decision to pay the Toney family the lower assistance amount.

The plaintiffs, Janet and Ronald Clark and their six minor children, were receiving $591 per month in 1986 and continued to receive that amount through June 1987. At that time, she and her children moved out of their home. The Department reduced her payments to $534. Under the rates effective before January 1, 1987, she would have received a monthly grant of $556. In September 1987, her husband rejoined the family, and Janet Clark requested that she be restored to the rates in existence before January 1. The Department refused on the ground that her grandfathered status had been cancelled.

To summarize, the Hightowers lost their grandfathered status be-

cause their family increased; the Clarks lost their grandfathered status because their family temporarily decreased; and Toney never had grandfathered status.

The defendants are the Illinois Department of Public Aid (Department) and Susan Suter, the present Director of Public Aid, who succeeded Edward Duffy, one of the original defendants.

### THE PLEADINGS

On June 12, 1987, Velma Hightower filed an individual complaint for administrative review in the circuit court. On July 24, 1987, she and her husband, Melvin Hightower, were granted leave to file a four-count amended complaint. Counts I, II and III of the amended complaint were class action counts. The named plaintiffs in counts I and II include Velma and Melvin Hightower and their children and Linda Toney and her children; only the Hightowers are named in count III. The plaintiffs sought class-wide declaratory and injunctive relief under the Illinois Public Aid Code (count I), the Social Security Act (count II) and the United States and Illinois Constitutions (count III). Count IV was Hightower's individual claim under the Administrative Review Act. Toney separately filed an individual complaint for administrative review on July 30, 1987. The *Toney* complaint for administrative review was consolidated with the *Hightower* amended complaint and assigned to Judge Roger Kiley.

On October 19, 1987, Janet and Ronald Clark and their children filed a two-count complaint. Count I was brought on behalf of a class including AFDC and GA applicants and recipients and alleged a violation of the Illinois Public Aid Code. (Ill. Rev. Stat. 1985, ch. 23, par. 12—4.11.) Count II was brought on behalf of a class including only AFDC applicants and recipients and alleged a violation of the Social Security Act. (42 U.S.C. §§602(a)(1), (a)(10) (1982); 45 C.F.R. §233.1 (1988).) The plaintiffs sought declaratory and injunctive relief under both counts. The *Clark* case was assigned to Judge Kenneth L. Gillis.

We pause to point out that the class claims of counts I and II of the *Hightower* complaint are the same class claims as counts I and II of the *Clark* complaint. The *Clark* complaint does not contain a constitutional claim. The Clarks never sought administrative review.

### TRIAL COURT PROCEEDINGS

On October 8, 1987, Judge Kiley allowed the defendants' motion to dismiss counts I, II and III of the *Hightower* complaint. The issue of class certification was never decided. Basing the dismissal on his interpretation of *People ex rel. Naughton v. Swank* (1974), 58 Ill. 2d

95, 317 N.E.2d 499, he said that he possessed jurisdiction only over the administrative review proceedings since the plaintiffs had invoked jurisdiction only over the administrative complaint initially filed by Hightower, and he had no authority to enlarge its context to include other claims. After notice of appeal from the order of dismissal was filed, Judge Kiley ruled in favor of Hightower and Toney in their administrative review complaints. He held that the rule adopted by the Department on January 1, 1987, violated section 12—4.11 of the Illinois Public Aid Code (Ill. Rev. Stat. 1985, ch. 23, par. 12—4.11). We note at this point that the administrative review claims were based on the same legal argument as count I of the *Hightower* and *Clark* complaints. The Department did not appeal Judge Kiley's ruling in favor of Hightower and Toney. We do not have the report of proceedings before Judge Kiley when he ruled. The order simply recites, in effect, that the January 1, 1987, regulation should be held for naught. Therefore, we cannot be certain of the grounds upon which Judge Kiley based his ruling.

In the *Clark* action, Judge Gillis allowed class certification, but he came to a conclusion opposite to that reached by Judge Kiley. Judge Gillis allowed the defendants' motion for summary judgment and held that the rule adopted by the Department on January 1, 1987, did not violate the Illinois Public Aid Code (Ill. Rev. Stat. 1985, par. 23, par. 12—4.11) or the Social Security Act (42 U.S.C. §§ 602(a)(1), (a)(10) (1982)).

### THE CLARK APPEAL

The defendants have filed a motion to dismiss the *Hightower* appeal, in part, on the ground that the judgment in the *Clark* case was *res judicata* on an issue in the *Hightower* case, because Clark is a member of the *Hightower* class. Since our decision in the *Clark* case will bear on the motion to dismiss in the *Hightower* case, we will consider the *Clark* appeal first.

### A. THE STATE STATUTE

As previously noted, the Illinois Public Aid Code was amended effective January 1, 1985 (Ill. Rev. Stat. 1985, ch. 23, par. 12—4.11). Before that amendment, aid payments could be reduced for (1) changes in the cost of items included in the standard of need, (2) changes in the expenses of the recipient, (3) changes in the income or resources available to the recipient or (4) changes in grants resulting from adoption of a consolidated standard of need. That amendment added a fifth ground for possible reduction of payments: "[T]o accom-

plish the adjustment described in the [newly added] preceding paragraph."

The "preceding paragraph" referred to in the above-quoted language, in turn, refers to another newly added "preceding paragraph." Consequently, clarity requires that both "preceding" paragraphs be set forth:

"In recognition of the inability of low income households to afford the rising costs of energy, payments made by the Department under Articles IV and VI shall include an amount of money to offset, in whole or in part, the costs of energy associated with seasonal variations. The Department may by rule establish the amount of such energy payments which may vary in accordance with the size of the assistance unit. The Department for reasons of administrative simplicity may provide such amounts in equal monthly payments.

During the first month that the Department pays grants which include amounts authorized in the preceding paragraph, such grant amounts for all sized assistance units within each program the Department administers under Article IV of this Code and for assistance units of more than one person under Article VI of this Code shall be adjusted to approach more closely a single percentage of the standard of assistance established under this Section, with grant amounts expressed in whole dollar amounts. The percentage used for Article IV need not be the same percentage used for Article VI. Federal Energy Assistance money provided in a separate payment and identified as being exclusively for energy assistance shall not be considered as part of the grant for the purposes of this paragraph; all of the grant amount, including any portion thereof that may be provided for the purpose of energy assistance provided under the preceding paragraph, shall be considered under this paragraph."

The Department agrees that no reduction in payments will be permitted unless it comes within an exception set out in the statute. (*Heinrich v. Illinois Department of Public Aid* (1970), 129 Ill. App. 2d 65, 262 N.E.2d 785.) And the plaintiffs agree that the plan adopted in 1985 by which payments were reduced for at least some of the aid recipients met the requirements of the fifth exception. But it is the plaintiffs' contention that the exception ceased to exist after January 1985. In short, the plaintiffs argue that the statute is one of empowerment and that the power died after January 1985. The defendants disagree and argue that the statute is mandatory, that is,

that the legislature required the equalization of all percentages of payments but did not set any timetable for the Department to act. We do not agree with either construction; although we concede that the amended statute is not a model of clarity and the arguments advanced by the parties are not to be lightly dismissed.

■■ ■ It is true, as the defendants argue, that the statute provides that the grants "shall be adjusted" and that "shall" is generally interpreted to be mandatory, and not directory, unless the context of the statute indicates otherwise. (*In re Application of Rosewell* (1983), 97 Ill. 2d 434, 454 N.E.2d 997.) It is the primary rule of statutory construction that the intention of the legislature should be ascertained and given effect. (*People v. Robinson* (1982), 89 Ill. 2d 469, 433 N.E.2d 647.) No formalistic rule of grammar or word form should stand in the way of carrying out the legislative intent. Consideration must be given to the legislative history, the language of the statute, its subject matter, the importance of its provisions, the relation to the general object intended to be accomplished by the act, and finally, whether or not there is a public or private right involved. *Rosewell*, 97 Ill. 2d at 440.

■ It is our judgment that the statute is directory and not mandatory. To begin, the Public Aid Code, considered as a whole, evidences legislative recognition of the great responsibility imposed on the Department of Public Aid and the need that a wide range of discretion be given the Department. The Code empowers the Department to "[e]stablish specific standards, by rule, by which grant amounts and need for public aid will be determined" and authorizes the Department to "amend such standards from time to time as circumstances may require." Ill. Rev. Stat. 1987, ch. 23, par. 12—4.11.

Section 12—4 refers to "powers, duties and functions of the Department" and identifies section 12—4.11 as a power granted, not a duty. The only restriction on the power granted by section 12—4.11 to fix standards is the requirement that the standards be established "by rule."

More important, however, is the language of the provision itself: the grant amount "shall be adjusted to *approach more closely* a single percentage of the standard of assistance." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 23, par. 12—4.11.) Language of a statute that an agency shall "approach more closely" a single percentage is not the stuff of which mandates are made. It should be obvious that whether a percentage "approaches" other percentages "more closely" calls into play a considerable amount of discretion on the part of the Department. Where a statute reposes discretion, it is directory and not

mandatory. See *Tuthill v. Rendleman* (1944), 387 Ill. 321, 56 N.E.2d 375.

Last, it is clear that the Department itself did not construe the language to be mandatory, as evidenced by its exemption of 2% of aid recipients. The interpretation of a statute by the agency charged with the administration of the statute is entitled to substantial deference. (*Eddings v. Department of Labor* (1986), 146 Ill. App. 3d 62, 496 N.E.2d 1167.) The belated and somewhat astonishing suggestion of the Department that its exemption of certain classes of families was a benevolent, but nonetheless *ultra vires*, act is not persuasive. For these reasons we hold that the act did not impose a mandatory duty on the Department to equalize the percentage of the standards of assistance.

On the other hand, we do not agree with the plaintiffs' claim that the legislature intended to grant the Department only the month of January 1985 to effectuate any plan under section 12—4.11 which would result in a reduction in payments.

■ The judge expressed the reasons for his ruling. Among them were his perceived results of the plaintiffs' construction and "common sense." The plaintiffs' opening brief raised arguments against the reasons ascribed by the trial judge; but, as the plaintiffs correctly note in their reply brief, the defendants did not respond to the plaintiffs' argument. We agree with the plaintiffs that the defendants have apparently refused to adopt the reasoning of the trial judge. Under some circumstances the defendants' refusal to answer the plaintiffs' argument might be considered a waiver; but a reviewing court's responsibility for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override considerations of waiver. (*Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831.) Moreover, this case involves an issue of considerable public importance. Therefore, the arguments against the judge's reasoning made by the plaintiffs, but not answered by the defendants, have been considered by this court; and we agree, in substance, with the reasoning of the trial judge.

An expansion of the plaintiffs' argument is required. The plaintiffs concede that the Department would have acted properly, if, in the month of January 1985, it had thrown the equalization net over all the recipients of public aid, regardless of the depth of the reductions and how many people were affected; but, they argue, by letting 2% of the recipients to escape the net, it lost not only that 2% irretrievably, but all future applicants situated similarly to the fortunate 2%—for example, the plaintiff Toney. In short, the Department had its chance but missed it.

■ That construction of a statute will be avoided which would lead to an absurd or unjust result. (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 489 N.E.2d 1374.) If the plaintiffs' interpretation of legislative intent is correct, the legislature knowingly gave power to the Department for 31 days with unfettered discretion to reduce payments for some aid recipients but to exercise largesse for the others. In our judgment, such a result would be unjust and unreasonable.

In determining legislative intent, it is proper to consider the legislative history, the reason for enactment and the circumstances that led to its adoption. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 469 N.E.2d 167.) The history of the administration of the Public Aid Code and its relation to the Social Security Act discloses the breadth and depth of the long-standing problem facing the Department in the fixing of public aid payments and in complying with Federal regulations. Knowing the problems faced by the Department for at least 10 years and the attempts by the Department, covering a period of years, to satisfy the Federal agency, it is inconceivable to us that the legislature would give the Department only the ephemeral power as suggested by the plaintiff and require the Department to solve the problem in 31 days. It is not probative on the question of legislative intent, as the plaintiffs argue, that the Department was able to equalize 98% of the recipients in a short period of time. Nor do we find persuasive the plaintiffs' argument that equalization could have been achieved without reduction. (We will discuss the validity of that argument later.) The narrow issue before us is not whether the Department acted wisely or efficiently; the issue is whether it was required to act during a 31-day period only.

■ ■ While the plaintiffs have resisted the defendants' argument that the statute imposed a mandatory duty on the Department to equalize standards, the thrust of their own argument is that it was mandatory on the Department to exercise its discretionary power within 31 days, or not at all. Express statutory time limitations imposed upon public officers have been considered in a number of cases. It is the general rule that if a provision of a statute states the time for performance of an official duty, without any language denying performance after a specified time, it is directory. However, if the time period is provided to safeguard someone's rights, it is mandatory, and the agency cannot perform its official duty after the time requirement has passed. (*Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 373 N.E.2d 1332.) We point out that the statute does not express a time limitation. Instead, we are asked to infer that the ex-

piration of the 31 days of January 1985 ended the Department's power to act. The plaintiffs have cited no case in support of the proposition that a mandatory time limitation may be inferred; and our research has disclosed none.

The heart of the plaintiffs' argument is that the power to adjust percentages was inextricably tied to the initial energy payments made and is based on the assumption that energy payments could be made only in the month of January 1985. That is an unfounded assumption. There is no such limitation in the Act. The statute simply provides that the adjustment shall be made "[d]uring the first month that the Department pays grants" which include energy payments. Our reading of the Act leads to the contrary conclusion that energy payments might be made at anytime. It would not have required any particular dexterity in draftsmanship for the legislature to say what the plaintiffs contend that it meant to say. The fact is that the legislature did not say it, and we conclude that the legislature did not mean to say it.

For these reasons, we hold that the action of the defendants in promulgating the plan in January 1987 did not contravene chapter 23, section 12—4.11.

### B. THE SOCIAL SECURITY ACT

In count II of their amended complaint, the plaintiffs contend that the Department's Plan violates the Social Security Act and its implementing Federal regulation. The statute provides, in part, as follows:

> "A State [AFDC] plan *** must (1) provide that it shall be in effect in all political subdivisions of the State ***;
>
> * * *
>
> (10)(A) provide that *** aid to families with dependent children shall *** be furnished with reasonable promptness to all eligible individuals ***." 42 U.S.C. §§602 (a)(1), (a)(10) (1982).

The regulation provides, in part, as follows:

> "(a) *State plan requirements.* A State [AFDC] plan *** must:
>
> (1) Specify the groups of individuals, based on reasonable classifications, that will be included in the program, and all the conditions of eligibility that must be met by the individuals in the groups. The groups selected for inclusion in the plan and the eligibility conditions imposed must not exclude individuals or groups on an arbitrary or unreasonable basis, and must not result in inequitable treatment of individuals or groups in the

light of the provisions and purposes of the public assistance titles of the Social Security Act. Under this requirement:

* * *

(iv) Eligibility conditions must be applied on a consistent and equitable basis throughout the State." 45 C.F.R. §233.10(a)(1)(iv) (1988).

Reduced to its most simple terms, regulation 45 C.F.R. §233.10(a)(1) (1988) ("the equitable treatment regulation") requires that State public assistance officials "treat like things alike." (*Watkins v. Blinzinger* (7th Cir. 1986), 789 F.2d 474, 481.) In this case, the plaintiffs contend that the grandfather regulation does not "treat like things alike" in that a family group in existence before January 1987 receives a larger monthly grant than a similarly situated group that first receives public assistance after January 1987.

At the outset we express recognition that the cases cited by the Department do not involve the equitable treatment regulation: *Jefferson v. Hackney* (1972), 406 U.S. 535, 32 L. Ed. 2d 285, 92 S. Ct. 1724; *King v. Smith* (1968), 392 U.S. 309, 20 L. Ed. 2d 1118, 88 S. Ct. 2128; *Dandridge v. Williams* (1970), 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153; and *Mitchell v. Blinzinger* (N.D. Ind. 1986), 646 F. Supp. 66.

The plaintiffs have cited cases in which the courts have held that a State regulation violated the equitable treatment regulation: *Blum v. Bacon* (1982), 457 U.S. 132, 72 L. Ed. 2d 728, 102 S. Ct. 2355; *Rosado v. Wyman* (1970), 397 U.S. 397, 25 L. Ed. 2d 442, 90 S. Ct. 1207; and *Martinez v. Trainor* (N.D. Ill. 1976), 435 F. Supp. 440.

In *Blum v. Bacon*, the Supreme Court struck down a New York regulation that excluded emergency assistance to AFDC recipients but provided such assistance to other public aid recipients. In *Rosado v. Wyman*, the court invalidated a New York regulation that provided higher payments to AFDC recipients in New York City than to recipients in Nassau County. In *Martinez v. Trainor*, the plaintiffs successfully challenged the Department's rule which paid lower benefits to mothers under 21 years of age than those paid to otherwise identically situated mothers over 21 years of age.

We do not believe that any of the plaintiffs' cases are factually apposite or controlling here. All involved final and permanent State regulations; none of them dealt with a regulation whereby the public aid agency sought to *gradually* effect a plan which, it hoped, would ultimately satisfy the Federal agency that was a major source of its funding.

The trial judge based his ruling, in part, on his conclusion that

the grandfather regulation was a "benevolent provision which allowed people who had become accustomed to a particular standard to stay on that standard" and was "reasonable." He held that the equitable treatment regulation did not require "immediate compliance" and that the Department had "the right to cushion changes and to not make them immediate." He identified the inequitable treatment as one existing "in the short run." Once again we agree with the substance of the trial judge's reasoning.

■ The plaintiffs have advanced several arguments against the reasoning of the trial judge. One of those arguments vividly illustrates the quandary the Department faced in its attempt to ensure that Federal funds would be available. The 1985 statute itself and the 1987 regulation were prompted by warnings from the Department of Health and Human Services that the Illinois Department's practices were contrary to Federal law and that Illinois might lose its right to Federal funds. The plaintiffs now tell us that the local Federal administrator's interpretation of the law was wrong and is entitled to no deference. In substance, the plaintiffs argue, the Department should have ignored the Federal administrator's warnings, thrown down the gauntlet, litigated the matter and taken its chances on losing Federal funds. We find no persuasiveness in this argument. Besides, whether the Federal administrator was right when he warned the defendants that the right of Illinois to Federal funds was in jeopardy is not properly before us. The question has not been briefed nor appropriately argued. We point out that the plaintiff did not make the Secretary of Health and Human Services a party to this action.

The plaintiffs also argue that the Department had two options available after 1985: It could have adopted the plan it did; or it could have adopted a plan now suggested by the plaintiffs. (We will discuss the plaintiffs' plan later.) We disagree that the Department had only two options: It had, and has, the third option of scrapping the grandfather provision completely. The plaintiffs' failure to include this third option is apparently based on their erroneous assumption that after January 1985 the Department was powerless to effect any reductions.

The plaintiffs' principal argument, set forth in their brief, is that equalization could have been, and can be, achieved without reductions:

> "It may do so by *selectively* allocating money made available
> for grant increases to families being paid a lower percentage
> of the standard of need, and withholding any increases from

families being paid a higher percentage of the standard of need, until the grants of all families are 'fully equalized'." (Emphasis added.)

While we have some difficulty understanding the mechanics of "selectively" allocating money and "selectively" withholding any increases, it is clear to us that the plaintiffs' suggested plan, again as expressed in their brief, depends on the amount of money available:

"At any given time, a state may make equalization adjustments in two basic ways, *depending on whether it has additional dollars to put into the public assistance pot. If a state has no additional dollars to allocate to grants, it will have to reduce grants to make progress on equalization.* If a state does have additional dollars to allocate to grants, it can make equalization adjustments without reducing grants and, if there is enough additional money, it can accomplish full equalization in one set of grant adjustments without reductions.

If a public aid department is required to equalize its grants completely in one set of adjustments (i.e., adjustments made at single time), *but there is no additional money for the grants or not enough money to pay the necessary increases, then it will have to reduce grants to achieve the full equalization goal.*" (Emphasis added.)

It thus appears that the plaintiffs' plan is presumptively based on an uncertain underpinning: legislative beneficence.

The plaintiffs concede that the length of time for equalization under their plan depends on how long it takes for the necessary funds to be appropriated. They also concede that under their plan some families receiving public assistance who need larger grants will not receive them and that some families could continue to receive a higher percentage of the standard of need than other similarly situated families. How long that condition would exist depends on how much the legislature appropriates. The plaintiffs also recognize that all those now enjoying grandfathered status will lose that status some time in the unknown future.

We judge the plaintiffs' argument to be that, while its own plan has equitable shortcomings, it is a better one than the Department adopted. In addition to a repeated reference to the shaky fiscal basis of the plaintiffs' argument, an appropriate answer to their suggestion that we should impose another plan on the Department is contained in *Dandridge v. Williams* (1970), 397 U.S. 471, 487, 25 L. Ed. 2d 491, 503, 90 S. Ct. 1153, 1162-63:

"We do not decide today that the Maryland regulation is

wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration [citation]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. [Citations.]"

In a similar vein, the Supreme Court has held that "[a] legislature may address a problem 'one step at a time,' or even 'select one phase of one field and apply a remedy there, neglecting the others.' " (*Jefferson v. Hackney* (1972), 406 U.S. 535, 546, 32 L. Ed. 2d 285, 296, 92 S. Ct. 1724, 1731, quoting *Williamson v. Lee Optical* (1954), 348 U.S. 483, 489, 99 L. Ed. 563, 573, 75 S. Ct. 461, 465.) The observations of the Supreme Court in both *Dandridge v. Williams* and *Jefferson v. Hackney* were made in the context of the equal protection clause of the Constitution, but we believe the observations are of equal applicability in the context of the equitable treatment regulation.

It is our holding that the plan adopted by the Department, while not perfect and to some degree inequitable, represented a good-faith effort to comply with Federal directives that the Department had the right to accept as lawful, and at the same time to reduce the impact of its plan upon larger families. As we have pointed out, if we were to hold otherwise, the Department could be in complete compliance by immediately abrogating the plan. We refuse to believe that that is the end, "a boon to me too or no one," desired by the plaintiffs. We repeat that the plaintiffs recognize that all those now grandfathered will lose that status someday. Consequently, we hold that the plan adopted by the Department in January 1987 does not contravene the Social Security Act or its attendant regulations.

For these reasons, the judgment of the circuit court on the *Clark* appeal is affirmed.

### THE HIGHTOWER APPEAL

The *Hightower* complaint was dismissed by Judge Kiley, who held

that he lacked jurisdiction to entertain the class claim because of the pendency of the administrative review complaint. The sole issue before us on the merits of the appeal is whether Judge Kiley properly refused to entertain the *Hightower* complaint. The defendants have filed a motion to dismiss the *Hightower* appeal on the grounds of mootness and *res judicata.* Although the plaintiffs have answered the argument on *res judicata* as though it were properly before us, we are uncertain that *res judicata* is a question to be decided in a reviewing court. We prefer to treat the argument as a part of the argument on mootness, since we believe our holding in the *Clark* appeal is pertinent to the question of mootness.

The defendants contend that the appeal is moot since Hightower and Toney have received the relief they sought under their complaints for administrative review. In support of their position the defendants cite *People ex rel. Newdelman v. Weaver* (1972), 50 Ill. 2d 237, 278 N.E.2d 81. In *Newdelman,* plaintiffs, who were not public aid recipients, sought *mandamus* and declaratory relief against the Department of Public Aid; and other plaintiffs, who were public aid recipients, alternatively sought administrative review of a Department decision. All claims contended that the Director of Public Aid was improperly withholding security rent deposits as provided by the Public Aid Code. The trial judge dismissed the claims for *mandamus* and declaratory relief; and the appellate court reversed. (*People ex rel. Newdelman v. Swank* (1970), 131 Ill. App. 2d 73, 264 N.E.2d 794.) The supreme court granted the Department leave to appeal.

While the case was pending in the appellate court, one of the public aid plaintiffs filed a separate action for administrative review. Her request for relief had been denied by the Department, and she made the same claim under the administrative review complaint that had been made in the *mandamus* and declaratory complaint. The circuit court ruled in her favor; and that judgment was affirmed in the appellate court. *Figures v. Swank* (1970), 128 Ill. App. 2d 211, 263 N.E.2d 599.

As a result of the *Figures* opinion, the Director of Public Aid issued a directive in which he authorized the granting of the relief sought in *Newdelman* to all future applicants. The supreme court held that the *Newdelman* appeal was moot, because the plaintiffs had received what they were seeking from the Department's directive, that is, prospective relief.

That is not precisely the posture of this case. There has been no directive from the Director of Public Aid ordering prospective relief to all future claimants. To the contrary. We have been informed that

after Judge Kiley's decision in Toney's favor on her administrative review complaint, which was not appealed by the Department, Toney secured employment and became ineligible for public aid benefits. However, in April 1988, after notice of appeal had been file in this case, Toney again applied for aid. The Department granted her application but paid her a lower benefit in accordance with the 1987 plan. In effect, the Department ignored the previous holding of Judge Kiley. Consequently, we do not believe that *Newdelman* is controlling.

■■ ■ An issue is moot when no actual rights or interests of the parties remain or where events occur which render it impossible for the reviewing court to grant effectual relief to either party. The court should not resolve moot issues merely to establish precedent or to guide potential future litigation. *West Side Organization Health Services Corp. v. Thompson* (1980), 79 Ill. 2d 503, 404 N.E.2d 208.

An exception to the mootness doctrine exists in certain cases involving the public interest. In addition to the degree of public interest involved, a court should consider whether it is desirable to make an authoritative determination of the question for guidance of public officials and whether the question is likely to recur. (*Village of Palatine v. La Salle National Bank* (1983), 112 Ill. App. 3d 885, 445 N.E.2d 1277.) This case does involve a substantial public interest, and we believe that it is desirable to make an authoritative determination of the question for the guidance of public officials. However, we have made that determination this day in the *Clark* appeal that the Department's regulation does not contravene the Public Aid Code or the Social Security Act. That being so, the next question is whether the claims in the *Clark* appeal are the same claims in the *Hightower* and *Toney* appeals. The plaintiffs contend that *res judicata* does not apply because, they say, the requisite identities of parties and claims are not present. Stated briefly, we disagree. In our judgment, Clark, Toney and Hightower are all members of the same class, although each may be, in turn, a member of a subclass; and the claims are the same.

We also point out that the plaintiffs took a different position in the trial court. They moved for a consolidation of the *Clark* complaint, then pending before Judge Marovich, with the *Hightower* and *Toney* complaints for administrative review, then pending before Judge Kiley. They asked that after consolidation all cases be heard by Judge Kiley. In support of the motion, the plaintiffs said that the *Hightower* and *Toney* cases and the *Clark* case "present precisely the same federal and state substantive statutory claims against" the Department's plan. They also said that the "legal claims [in all cases]

are virtually identical." It is apparent to us that counts I and II of the *Hightower* complaint would be barred under the doctrine of *res judicata*. Therefore, it would serve no purpose to entertain the *Hightower* appeal and to reverse this case on a procedural ground only to order the trial judge to enter judgment on counts I and II in favor of the Department. It is clear, therefore, that the appeal is moot as to counts I and II.

A more troublesome question is presented with regard to count III, in which only Hightower alleges that the action of the Department violated the Federal and Illinois constitutions. That claim is not present in the *Clark* complaint. While all three plaintiffs, Hightower, Toney and Clark, attack the regulation under the Illinois statute and the Social Security Act, only Hightower alleges a constitutional violation. Her claim, in substance, is that the regulation, as applied to her, punishes her for having more children. However, that same claim was made in her complaint for administrative review, which was adjudicated in her favor. Insofar as the record is concerned, we must infer that the Department continues to pay, and will pay, Hightower under the provisions of the grandfather clause. Assuming we were to reverse Judge Kiley's ruling and remand the case for consideration of Hightower's constitutional claim, the only relief available would be that which she is already receiving. Since we have no reason to believe that the problem will recur with her, we do not believe that count III of the *Hightower* complaint comes within the public interest exception and, therefore, is also moot. We are aware that the constitutional claim has not been clearly decided; but we are not convinced that such claims are so numerous that they need be decided in a class action. If that issue arises in the future, we see no reason why it cannot be decided in an administrative review action, the same procedure that was followed in *Figures v. Swank* (1970), 128 Ill. App. 2d 211, 263 N.E.2d 599, which ultimately led to a directive by the Director of Public Aid.

We wish to make our position clear that our holding in *Clark* should not be construed to bar any future payments to Hightower based on Judge Kiley's ruling in the administrative review complaint. For reasons never explained to us, the Department saw fit not to appeal Judge Kiley's ruling; and it would be manifestly unfair to permit the Department to avoid the effect of that failure to appeal and to require Hightower to relitigate the same issues. The Department could have done precisely what it did in *Figures v. Swank*.

In the memorandum filed by the Department in support of its motion to dismiss the *Hightower* appeal, it has referred to the second

*Toney* administrative review complaint and argues that that complaint is also barred by the *res judicata* effect of the *Clark* decision. We are unclear as to what precisely the Department is asking of this court with respect to the second *Toney* administrative review complaint. Whatever the Department may be asking, we refrain from giving, since the second *Toney* complaint is not before us for review. We have taken judicial notice of that complaint only insofar as it may be material to the public interest exception to the mootness doctrine. We note parenthetically that the second *Toney* complaint refers to Judge Kiley's previous ruling in her favor as a ground for relief.

For these reasons, the *Hightower* appeal is dismissed.

Appeal No. 1—87—3399, Appeal dismissed.
Appeal No. 1—88—2949, Judgment affirmed.

QUINLAN* and LaPORTA, JJ., concur.

---

*Justice Quinlan participated in the decision of this case prior to his resignation from the court.