BRUCE M. ABRAHAMSON, Plaintiff-Appellee, v. THE DEPARTMENT OF PROFESSIONAL REGULATION *et al.*, Defendants-Appellants.

First District (6th Division) No. 1—89—2465

Opinion filed February 22, 1991.

Neil F. Hartigan, Attorney General, of Springfield (William H. London, Assistant Attorney General, of Chicago, of counsel), for appellants.

Winston & Strawn, of Chicago (Edward L. Foote, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Bruce M. Abrahamson (Abrahamson), applied to the defendant, Illinois Department of Professional Regulation (DPR), for a medical license. His application was denied. In substance, the DPR found that the plaintiff demonstrated a lack of "moral character" and "ethical judgment." The circuit court reversed the denial. The DPR contends that the court erred. The principal issue is whether the deci-

sion to deny the plaintiff's application was against the manifest weight of the evidence.

Abrahamson graduated from Autonomous University of Juarez, Mexico (Juarez), in February 1981. Before graduation, from August 1980 through January 1981, he performed part of his clinical training at Prince George's General Hospital and Medical Center in Maryland. After graduation he successfully completed three years of post-graduate training in surgery. From June 1981 through June 1982, he completed one year of postgraduate residency at Rush-Presbyterian-St. Luke's Medical Center in Chicago. From July 1982 through June 1983, he completed another year of training in general surgery at hospitals affiliated with the University of Maryland School of Medicine. From July 1983 through June 1984, he completed a third year in residency in general surgery at the Deaconess/Harvard Surgical Service.

In January 1981, he passed the examination administered by the Educational Commission for Foreign Medical Graduates (ECFMG). In 1985, he passed both components of the FLEX examination, which is the examination applicants must pass to be licensed in Illinois.

On June 6, 1986, Abrahamson applied to the DPR for a license to practice medicine. After the DPR's review led it to question the accuracy of two answers on Abrahamson's application, representatives of the DPR held an informal conference on November 24, 1986, with Abrahamson and his attorney.

Part B, question 6 of the application had asked Abrahamson to list occupational schools he had attended. He listed one school, Autonomous University of Juarez, Mexico. At the informal conference, Abrahamson revealed that he had been enrolled at the Indiana University School of Medicine (IUSM) in addition to Juarez. Part D, question 2 had asked whether Abrahamson had ever been denied a license, permit, or privilege of taking an examination by any licensing authority. Abrahamson answered "No." At the informal conference, Abrahamson revealed that he had applied for licensure in Indiana, South Dakota and Pennsylvania and had not been granted a license in any of those States.

On November 25, 1986, Abrahamson submitted an addendum to his original application. The addendum explained Abrahamson's failure to disclose his attendance at IUSM on his original application; he said that he believed that the question only requested a list of schools from which he had received a degree. He explained that because he did not receive a degree from IUSM, he did not list it.

Additionally, the addendum explained Abrahamson's failure to disclose his applications for licensure in other States. He had sat for the

FLEX examination in Indiana in 1981, and he received a score of 74.9. Because his score was below the passing score of 75, Indiana could not process his license application. He was denied permission to take the Indiana FLEX examination again in 1984 because his file was incomplete. After reviewing a provision of the Indiana Administrative Code, he concluded that his application had not been formally considered and denied, but had merely been "returned without consideration." The addendum also explained that Abrahamson sat for the South Dakota FLEX exam in December of 1982, and he had received a score of 73. Because the passing score in South Dakota also was 75, his application to be licensed in that State could not be processed. He submitted an application to Pennsylvania in February of 1985, believing that Pennsylvania permitted an applicant to combine FLEX scores from more than one sitting to obtain a passing grade. Shortly after he submitted his application, he learned that this policy was no longer in effect. His application was held in the Pennsylvania State Board's office without action until June 14, 1985, when the Board returned his application fee.

The addendum also included a chronological summary of Abrahamson's medical education, explaining his dual enrollment at IUSM and Juarez. The summary indicated that after completing his first year of medical school at Juarez, he transferred to IUSM. At IUSM, he passed two courses and failed two courses. In September 1978, he became very discouraged with IUSM, and he returned to Juarez in October 1978. The addendum clearly stated that he was attending both schools during October 1978.

He finished his second year of medical school at Juarez in June 1979. Because he had failed two courses during his first trimester at IUSM, he was not eligible to attend classes at IUSM during the second and third trimesters of the 1978-79 academic year.

Abrahamson returned to IUSM in August 1979 to repeat the two courses he had failed the previous year. In late September 1979 he registered at Juarez for his third year of medical school. During October 1979 he primarily attended classes at Juarez; however, he also attended some classes and took some tests at IUSM.

He completed his coursework at Juarez from February through August 1980. Because he passed the two classes he took at IUSM during the first trimester in August 1979, he automatically remained enrolled and eligible for classes at IUSM through the end of the 1979-80 academic year. He attended very few classes, and he may have taken one or two tests during that year. Because he did not take final examinations at the end of the year, he was dismissed from IUSM.

On January 14, 1987, Abrahamson appeared in person at a hearing before the Illinois Medical Licensing Board (Board), which consists of licensed physicians. He restated the information contained in the addendum. He emphasized that the only overlap in attendance between the two schools occurred for a few weeks in October 1978 and in October 1979. He explained that although he was enrolled at IUSM from September 1979 through January 1980, he attended very few classes at IUSM during that time. While he was dually enrolled at both schools, he stated, he was not actually attending classes at both schools. Attendance was not compulsory at either school.

The Board decided to take additional time to render a decision on Abrahamson's application. The only issues before the Board at that time were possible dual enrollment in Juarez and IUSM and his applications for licensure in other States. The matter was to be continued for a month, but the record reflects no hearing before the Board itself until September 9, 1987.

In the meantime, on April 29, 1987, the DPR notified Abrahamson of an intent to deny his application. The notice informed him that the DPR intended to deny his application for the following reasons: "1) You have made false statements to the Department in connection with your application. 2) You have failed to, in fact, meet the educational requirements of the Medical Practice Act. 3) You caused to be printed a false and fraudulent transcript of credit hours from Indiana University Medical School capable of defrauding the public and this Department." A formal evidentiary hearing was scheduled for August 5, 1987; however, Abrahamson's attorneys objected to the evidentiary hearing. Therefore, in lieu of the hearing, the parties agreed to take the deposition of a printer named Ruben Dominguez.

Dominguez testified that he was employed by PIP Press in Las Cruces, New Mexico. He described PIP Press as a "basic printing shop," specializing in printing business forms, envelopes and letterheads. He identified a transcript of courses taken and grades received at IUSM bearing Abrahamson's name; the document had been produced at his shop. He could not remember exactly when the document had been printed; however, it was probably around 1979 or 1980; it could have been as early as 1975. When asked for whom the document had been printed, he said that the document was printed for Abrahamson. However, he did not know whether Abrahamson had ever actually received the document.

He further testified that, on the same day he printed the transcript, he discussed the document with his neighbor, Ruth Anderson,

an administrative assistant for some type of medical society. He gave copies of the transcript to Anderson on the following day.

In February 1987, Dominguez was questioned by Robert Hewson, a DPR investigator. Dominguez identified the document and told Hewson that it had been printed in his shop. Hewson then showed him photographs of six men, and Dominguez identified Abrahamson's picture as a picture of the man who had commissioned the printing of the transcript. He further testified that he had printed thousands of orders since 1975; however, he could recall having printed only one transcript from IUSM.

On September 9, 1987, another hearing was held before the Board to further review Abrahamson's application. At the hearing, Abrahamson denied that he had commissioned the printing of the IUSM transcript; however, he admitted that the date on the transcript corresponded with the date he entered IUSM. His attorney submitted an affidavit from the director of Juarez certifying that the false transcript was never used by Abrahamson to obtain academic credit at Juarez. (Abrahamson had already testified before the Board on January 14, 1987, that he used at Juarez only one of the credits he received at IUSM.)

Once again, Abrahamson explained his dual enrollment at IUSM and Juarez. He noted that he was enrolled at IUSM during part of the time that he was living in Juarez and attending classes at Juarez; he periodically went back to Indiana during that time for the purpose of taking some tests. When asked whether he had been present at a systemic pathology laboratory class on 12 specific dates between November 1979 and February 1980, Abrahamson replied that he did not remember whether he had been present.

Robert Hewson, the investigator for the DPR, presented an attendance report for the systemic pathology laboratory, which he had received from a professor at IUSM. The report, which was introduced over objection by Abrahamson's attorney on the ground that it constituted hearsay, indicated that Abrahamson was present on all test dates except the final one, and that he was also present at 12 out of 13 scheduled lab sessions between November 9, 1979, and February 29, 1980. Hewson did not know how the professor took attendance. He testified that he did not see any of the original records, such as a sign-in sheet, from which the attendance summary had been prepared.

The Board also questioned Abrahamson regarding statements he had made on his application to take the ECFMG. Abrahamson testified that he did not have a degree from Indiana University, and that he did not remember whether he had indicated on his ECFMG appli-

cation that he had a bachelor of arts degree from Indiana University. He admitted that he did claim to have a bachelor's degree from Indiana University on his applications to the State of Indiana and the State of Pennsylvania. He explained those discrepancies, stating that he completed the applications after he had contacted the registrar's office at Indiana University and had been informed that he had accrued enough hours as an undergraduate to be eligible for a degree.

Hewson testified that the DPR had received copies of the IUSM transcript from Indiana University. He noted that the university had received the transcript from a medical society in New Mexico, which had obtained the transcript from Dominguez. Hewson admitted that Abrahamson never tendered the false transcript to the DPR in an effort to obtain licensure in Illinois.

At the next hearing on February 10, 1988, the Board voted to recommend that Abrahamson's application be denied on the grounds of lack "of moral and ethical judgment." The Board met again on March 9 for the purpose of establishing the findings of fact. The Board found Abrahamson "to be not credible and unworthy of belief" and made the following conclusions:

(1) The evidence clearly and convincingly demonstrated that Abrahamson caused a false and fraudulent transcript of courses purportedly taken at IUSM to be printed.

(2) The evidence clearly and convincingly demonstrated that Abrahamson's description of dual enrollment and attendance at the two medical schools was inconceivable.

(3) The evidence clearly and convincingly demonstrated that in the pursuit of a medical license in Illinois Abrahamson made numerous misstatements of material facts regarding his academic credentials, schools and periods of actual attendance, degrees conferred, applications for licensure in other jurisdictions and his involvement in the production of false and fraudulent academic credentials.

(4) The evidence clearly and convincingly demonstrated Abrahamson's failure to be forthright and truthful before the Board and, thus, demonstrated a complete lack of moral character.

(5) The evidence clearly and convincingly demonstrated Abrahamson's involvement in the fraudulent production of academic credentials and, thus, demonstrated a complete lack of proper ethical judgment.

The Director of DPR accepted the recommendation of the Board and denied Abrahamson's application. The denial order noted that Abrahamson could reapply for licensure after two years from the date of the order. The circuit court reversed the Director and ordered the

DPR to issue a license to the plaintiff. We allowed the DPR's motion to stay the court's order.

■■ In an administrative review of an order of the DPR relating to licensure, a reviewing court is limited to determining whether the DPR's conclusion was supported by substantial evidence, or whether it was contrary to the manifest weight of the evidence. (*Middleton v. Clayton* (1984), 128 Ill. App. 3d 623, 470 N.E.2d 1271.) If the record discloses that the DPR's decision is supported by substantial evidence, this court must affirm its decision. *Garland v. Department of Labor* (1984), 104 Ill. 2d 383, 472 N.E.2d 434.

■■ The DPR relies on two sections of the Medical Practice Act (Act) in support of its ruling. The DPR first asserts that it may deny an application if it is not satisfied that the applicant is of good moral character in accordance with section 9 of the Act. (Ill. Rev. Stat. 1987, ch. 111, par. 4400−9.) In determining moral character, the Board may consider whether the applicant has engaged in conduct which would warrant discipline under the Act. Ill. Rev. Stat. 1987, ch. 111, pars. 4400−22(A)(5), (A)(9), (A)(31).

■■■ The plaintiff has advanced several arguments which we will address briefly. He contends that the provision of the Medical Practice Act authorizing the denial of an application for failure to possess "good moral character" is void for vagueness and thus violates the due process clause of the Constitution, and he contends that, under the Act, the DPR may consider only felony convictions as evidence of a lack of good moral character. We disagree with both arguments. Under a statute requiring that an applicant for a license to practice medicine be of "good moral character," while the quoted term is ambiguous and may be defined in many different ways, it may be broadly defined to include elements of simple honesty, fairness, respect for the rights of others and for the law. (See *State ex rel. McAvoy v. Louisiana State Board of Medical Examiners* (1959), 238 La. 502, 115 So. 2d 833.) *Schireson v. Walsh* (1933), 354 Ill. 40, 187 N.E. 921, cited by the plaintiff, does not support his contention. In that case, it was the agency's definition of the term "good moral character" which was condemned; it was not the term itself. With respect to the plaintiff's argument that only a felony conviction may be considered, suffice it to say that the Act is to the contrary.

■■■ The plaintiff also contends that the charge that he had prepared the Dominguez transcript is barred by the statute of limitations. Section 22 provides that any violations of sections 22(A)(5) and (A)(31) may not be maintained more than five years after the date or act alleged to be a violation of the Act. (Ill. Rev. Stat. 1987, ch. 111,

par. 4400—1.) Again we disagree. The running of the statute of limitations against the DPR should not begin until the DPR knew or, at least, should have known of the alleged actions of the plaintiff in ordering the Dominguez transcript. There was no reason for the DPR to know of the existence of the Dominguez transcript and its significance until the plaintiff applied for a license.

■ We do agree, however, with the plaintiff's assertion that inadmissible hearsay evidence was introduced before the Board. (The DPR's own rules bar the admission of hearsay. (68 Ill. Adm. Code §110. 220 (1988).) The plaintiff had testified that he did not use his IUSM credits at Juarez, except one, and that he did not attend classes during a certain period at IUSM. He also introduced an affidavit from the director of Juarez, Dr. Abbud, which established that the plaintiff did not use the Dominguez transcript at Juarez and that the plaintiff was given credit for only one course taken at IUSM. The Board's investigator was permitted to testify, over objection, that he had a conversation with Dr. Abbud during which Dr. Abbud said things that might be construed as a contradiction of his affidavit and thereby the testimony of the plaintiff. Through the testimony of that investigator, the Board's attorney also introduced, over objection, a document prepared by an official of IUSM which purportedly showed the dates of attendance at IUSM by the plaintiff. The purpose of the document was to contradict the plaintiff's testimony. In our judgment the testimony of the investigator of his conversation with the director of Juarez and the document to which he testified were inadmissible hearsay. Because the evidence was directed to the question of the plaintiff's credibility upon which the Board's entire case relied, it was prejudicial and would justify a new hearing. See *Russell v. License Appeal Comm'n* (1971), 133 Ill. App. 2d 594, 273 N.E.2d 650.

■ We also agree with the plaintiff's contention that the Board's finding that the plaintiff had made "numerous misstatements of material facts" is vague and ambiguous. Even after oral argument, it was not clear to us precisely what statements or conduct on the part of the plaintiff the Board relied on in determining that he had made misrepresentations of material fact. Consequently, we have been required to examine the entire record. That examination discloses that the procedures followed by the DPR were unusual and, in large measure, unfair to the plaintiff. Indeed, we conclude that the procedures followed made a shambles of due process.

The DPR's initial investigation was prompted by its misgivings over two answers the plaintiff had made in his application *to the DPR*: He listed only Juarez as an occupational school he had attended

and he said he had not been denied a license or the privilege of taking an examination for a license. On January 14, 1987, the DPR and the plaintiff participated in an informal conference in which he explained the reasons for those answers he had made. After extensively questioning the plaintiff, the Board wanted more time to investigate. The attorney for the Board said that the only question left was dual enrollment. We judge that the reasonable inference to be drawn is that the attorney for the Board and the Board were satisfied with the explanations given by the plaintiff for his answer concerning his applications in three other States. The matter was to be continued for one month.

The investigation, however, was later broadened to include the transcript printed by Dominguez. Dominguez was interviewed by the DPR shortly after the January 14 conference; and on April 29 the DPR notified the plaintiff of an intent to deny his application for three reasons: he had made false statements to the DPR "in connection with [his] application"; he had failed to meet the educational requirements of the Medical Practice Act; and he had caused to be printed a false and fraudulent transcript of credit hours from Indiana University Medical School capable of defrauding the public and the DPR. We pause at this juncture to note that the DPR does not now maintain that the plaintiff has failed to meet the educational requirements of the Medical Practice Act.

We find it significant that the DPR intended to deny the plaintiff's application based on the IUSM transcript without ever having given the plaintiff an opportunity to confront the *ex parte* identification by Dominguez. In any event, fundamental due process requires the conclusion that Abrahamson should have been compelled to respond only to the allegations of the notice of intent to deny his application. Instead he was required to respond to more, much more, and without any previous notice that he would be required to respond.

After receiving the notice of intent to deny his application, the plaintiff and his attorney appeared before a hearing officer and one member of the Board on August 5, 1987. The hearing officer was aware of the notice of intent to deny and questioned the necessity of presenting any further proof. The attorney for the Board told the hearing officer that he wanted to present the testimony of Dominguez and the testimony of its investigator of a conversation he had had with the director of Juarez that would show Juarez relied upon the Dominguez transcript. When the hearing officer asked whether the transcript had been used in any way by the plaintiff, one of the attorneys for the Board said, "It's possible that they were. *** We do not

know for sure." After hearing from the attorneys for both sides, the hearing officer said this:

"I, at this point, want to make sure that we are confining this proceeding to the smallest manageable proceeding that is needed to place before the committee the tools that it needs to make a decision on *these* issues." (Emphasis added.)

The hearing was then adjourned, and the deposition of Dominguez was taken.

The wish of the hearing officer for the "smallest manageable proceeding" was ignored. Instead, the proceeding on September 9, 1987, was expanded and became both accusatorial and inquisitorial and personally insulting to the plaintiff. The plaintiff appeared before five members of the Board. The chairman had not been present at the January 14 hearing. The plaintiff was again extensively questioned by the Board members in relays. The questions were not restricted to dual enrollment. The attorney for the Board revived the question of the defendant's representation that he had a bachelor of arts or science degree. This time the question was directed to an answer the plaintiff gave when he applied to take the ECFMG examination. That examination, we note, is administered by an organization in Pennsylvania, not Illinois.

In an attempt to explain why he felt he was entitled to say he had an undergraduate degree from Indiana University, the plaintiff said that he had been informed by the registrar of Indiana University that he had sufficient hours for a degree. (No one ever refuted that statement that he had sufficient hours.) Included in his explanation was the information that his mother was the advisor to the board of trustees of Indiana University and Purdue University. One of the Board members then cross-examined him at length about his mother's qualifications to be an advisor. The Board member asked, "Does she get paid for it?" He wanted to know how often she met with the trustees and whether she was invited to their meetings. The exchange ended this way:

"[BOARD MEMBER]: Could you give me an example of why she was selected at being an advisor other than being an alumnus [*sic*]?

[PLAINTIFF]: No.

[BOARD MEMBER]: I hesitate to ask the next question, but I must: *Has your mother been active in any of the political parties in the State of Indiana?*

[PLAINTIFF]: No.

[BOARD MEMBER]: Then I would—would I be correct, in your opinion, by saying that this was not a political appointment?

[PLAINTIFF]: Doctor, the depth of questioning you are asking me about her employment, I really don't feel—

[BOARD MEMBER]: I am leading up to something, Doctor.

[PLAINTIFF]: I don't feel that.

[BOARD MEMBER]: You probably smell what I am leading up to, and I am going to get it right away, Mr. Chairman. During the time that you were discussing with [another Board member] earlier this last 20 minutes, half hour, whatever, you were in transit between two different schools and you were enrolled in two different schools simultaneously. *Do you have any reason to believe that your mother was or was not involved in you being enrolled and re-enrolled at Indiana Medical School at that time?*

[PLAINTIFF]: No." (Emphasis added.)

The impact of this prejudicial questioning was that the plaintiff did not know that his mother had used some influence but he did not know that she had not used influence either.

Dominguez had testified that the person who ordered the transcript did not wear glasses. The plaintiff testified that he had worn glasses since childhood. The same Board member who had questioned the plaintiff about his mother's qualifications said this: "Have you ever worn contact lenses? *Remember, you are under oath.*" (Emphasis added.) When the plaintiff said he was "uncomfortable" at IUSM, that same Board member asked if he was "uncomfortable" because his shoes were too tight.

At one point in the proceedings, the plaintiff's attorney made a proper objection to which the attorney for the Board said this:

"If I may, I would respectfully suggest that *your client's proclivity to lie and perjure himself on applications* is very germane to the issue of his character and fitness to be licensed in this State ***." (Emphasis added.)

After colloquy that followed that remark by the Board's attorney, the Board member who had questioned the plaintiff about his mother and had reminded him that he was under oath said this:

"[I] would like to state that [I am] neither an attorney nor a judge, but nevertheless would like to hear this particular subject pursued and regardless of what I did or did not say at [the previous hearing on January 14] there was no way of knowing,

as far as I can recall, *that there was a question of perjury at that time.*" (Emphasis added.)

It is apparent that the Board's attorney's prejudicial remark had struck home.

The chairman then continued the matter until February 10, 1988. On that date the hearing was presided over by the new chairman, who was the same member who had questioned the plaintiff about his mother's qualifications. Present were six other members, five of whom had not participated in any of the previous proceedings. The chairman said that they were there to consider the application of the plaintiff. The lawyer for the DPR and the lawyer for the plaintiff then made arguments. One of the new members of the Board who had not heard any of the evidence raised still another new obstacle for the plaintiff. That member pointed out that one of the letters in the record from Rush-Presbyterian-St. Luke's Hospital contained a warning to the plaintiff concerning attendance. That member said that it "seems to me that there is a behavior pattern here" and "wondered" if the plaintiff would like to respond. The plaintiff did respond. The chairman then read the letter into the record and gave his interpretation of it. Before submitting the matter to a vote, the chairman summed up as follows:

"There is the unquestioned attendance at two schools, there is conflict of how much attendance there was at one school and at another. We have inconvertable [*sic*] evidence he was at two different places at the same time exactly *and we know from the first law that cannot be.* We are also clear from your investigation that the head of the school at Juarez has indicated that there has been some classes or credits from the Medical School of Indiana but declines to indicate which ones were used to qualify the applicant for licensure there. *We have in the response or the question of [the new member of the Board] as to the pattern of behavior. We have the response to that question and specific questions of [the] letter.*" (Emphasis added.)

That language of the chairman refutes the DPR's argument that the Board did not take into consideration the investigator's hearsay testimony of his conversation with the director of Juarez and illustrates that the matter improperly raised by a new member of the Board without previous notice to the plaintiff was also considered.

The Board members then voted to recommend that the Director of the DPR deny the application for a license. On March 9, 1988, the Board met to approve the specific findings of fact. All but one of those present on February 10 were present on March 9. They voted

to adopt the specific findings. One of the members abstained, apparently on the ground that he was not present at the hearings. Among those findings approved by members who had not heard any witnesses, except the plaintiff explaining the hospital letter, was that the Board's investigator and Dominguez were credible and worthy of belief and that the plaintiff "based upon his statements, his testimony *and his manner in testifying*" was not credible or worthy of belief. (Emphasis added.)

■■ We must first address what appears to be a misconception of the law on the part of at least one of the Board members and the attorney for the DPR. The attorney for the DPR argued in this court that a distinction is to be made between actions to revoke or suspend a license and actions to deny an application. A member of the Board made a similar statement. Insofar as due process requirements are concerned, there is no distinction. An applicant for a medical license who has graduated from an accredited medical school and has passed all preliminary tests imposed by the statute should be entitled to a medical license unless it may be shown that he is lacking in "good moral character." The applicable language of the statute is as follows:

"Each applicant for a license shall:

\*\*\*

(B) Submit evidence satisfactory to the Department that the applicant:

(1) Is of good moral character. In determining moral character under this Section, the Department may take into consideration whether the applicant has engaged in conduct or activities which would constitute grounds for discipline under this Act. The Department may also request the applicant to submit, and may consider as evidence of moral character, endorsements from 2 or 3 individuals licensed under this Act." (Ill. Rev. Stat. 1987, ch. 111, par. 4400—9.)

The plaintiff submitted the endorsements required under the Act.

■■■ We judge that the burden of proof should be on the Department to show that the plaintiff is lacking "good moral character." Proceedings under an administrative agency are subject to the requirements of due process of law. (*Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 416 N.E.2d 1082.) Even under the most primitive form of due process an applicant should be given notice of why the State is refusing his application, and he should be given a hearing. A " 'fair trial in a fair tribunal is a basic requirement of due process.' " (*Scott*, 84 Ill. 2d at 54, quoting *In re Murchison* (1955), 349 U.S. 133, 136, 99 L. Ed. 942, 946, 75 S. Ct.

623, 625.) That principle applies to administrative agencies which adjudicate as well as to courts. (*Scott*, 84 Ill. 2d at 54-55, citing *Withrow v. Larkin* (1975), 421 U.S. 35, 46, 43 L. Ed. 2d 712, 723, 95 S. Ct. 1456, 1464.) *Scott* also instructs us that the combination of judicial and investigative functions is not a denial of due process. But we believe the holding of *Scott* is that due process is not denied because of the fact that the agency as a whole combines adjudicatory, investigative and prosecutorial functions. We do not believe that *Scott* stands for the proposition that the same individual in an agency may be the investigator, prosecutor and judge. It is proper to have some blend of judicial and prosecutorial function in an administrative proceeding provided that the person performing the quasi-prosecutorial function is not a member of the decision-making body. (*Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 530 N.E.2d 682; *Ladenheim v. Union County Hospital District* (1979), 76 Ill. App. 3d 90, 394 N.E.2d 770.) In this case, the DPR's notice to deny the application was at least a step in the right direction in that it notified the plaintiff of the reason for its denial; but it was the last such step. The hearing on September 7 went beyond the charges mentioned in the notice to deny, and the judges became both investigators and prosecutors. The hearing deteriorated into an unfair hearing and would justify a reversal and remandment for a new hearing.

 The plaintiff argues generally and correctly that administrative proceedings are governed by fundamental principles of due process. But his particular argument is that the DPR's findings were not based on competent and substantive evidence. He also argues that the ultimate findings are so vague and ambiguous that they violated constitutional due process. He does not, however, point out, as we do, the denials of procedural due process. We anticipate that the DPR will maintain that we have raised an argument that has not been raised by the plaintiff. We concede that that may be so. But the rule that points not argued in the appellate court are waived is an admonition to the parties, not a limitation upon the jurisdiction of a reviewing court. This is so because of the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent. (*Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831; *Hightower v. Duffy* (1989), 192 Ill. App. 3d 65, 548 N.E.2d 495.) We believe that the obligation to provide a just result and to provide guidance to the DPR in future similar proceedings requires our recognition that the plaintiff's rights to constitutional due process were violated.

Turning now to the substance of the DPR's argument that the DPR's findings were not against the manifest weight of the evidence, we *guess* that the plaintiff's false statements made before the hearing, upon which the DPR's order was based, were: (1) in applications to take examinations in Indiana, Pennsylvania, South Dakota and the ECFMG application as well as an application at Rush-Presbyterian-St. Luke's Hospital he answered that he had a bachelor of arts or bachelor of science degree; (2) in his application in Illinois he said that he had not previously been denied a license or an opportunity to apply for a license; and (3) his statement in his addendum to his application that he attended both Juarez and IUSM.

■■■ The Department concedes that, if the plaintiff had informed the DPR that he had previously been denied a license in Indiana, South Dakota and Pennsylvania, the denials of a license in those States would not be a ground for denying him a license in this State. Similarly, the Department concedes that if the plaintiff had answered on his Illinois application that he attended IUSM, that answer would not necessarily bar him from being licensed. The DPR simply says that such an answer might have prompted the Department to investigate further. Such an investigation would have disclosed no more than what the DPR ultimately learned. Because truthful answers would not have barred the plaintiff from being licensed, it is our judgment that any misrepresentation would not be material. In order for a misrepresentation to be material it must appear that the party to whom the misrepresentation was made would have acted differently if he had known the true facts. *Lytton v. Cole* (1964), 54 Ill. App. 2d 161, 203 N.E.2d 590.

■■■ We are not certain whether the DPR found that the plaintiff's answer on his Illinois application that he attended only Juarez was false or whether the DPR found that his addendum was false when he said he also attended IUSM. In either event, the DPR has failed to show how either representation would be material. The same can be said for the third finding that he made false answers in his applications to take examinations in Indiana, Pennsylvania, South Dakota and the ECFMG and his application for Rush-Presbyterian-St. Luke's Hospital. The DPR has failed to establish that if the plaintiff had informed the respective agencies that he had the equivalent of a degree, but not a degree, that he would not have been permitted to take the examinations or he would not have been hired by Rush-Presbyterian-St. Luke's Hospital. Consequently, the DPR's findings that the plaintiff's answers on his Illinois application, his answers concerning his dual enrollment and his answers in applications to take exami-

nations in Indiana, Pennsylvania, South Dakota and the ECFMG examination as well as his application at Rush-Presbyterian-St. Luke's Hospital were *material* misrepresentations of fact are erroneous and must be reversed.[1]

■■■ We next address the DPR's finding that the evidence clearly and convincingly demonstrated the plaintiff's failure "to be forthright and truthful before the Board." This finding must also be reversed, first, because the finding was based on a charge that was beyond those contained in the notice to deny application and thus violated the plaintiff's due process rights. Second, we agree with the argument of the plaintiff's attorney that such a finding is manifestly unfair under the circumstances. To put this case in perspective, assume that the plaintiff was already licensed and was charged with a specific violation of the Act; and he defended on the charge and testified. Could the DPR hold that the substantive charge had not been sustained but that the plaintiff's license would be revoked because his answers in defending the charge were not forthright and truthful? We agree with the plaintiff's attorney that the obvious answer is that the DPR could not do so, and it should not be permitted to do so here. Our conclusion is even more compelled when we consider that four of the six ultimate fact finders were persons who had not heard any witnesses and still determined that the plaintiff was not credible or worthy of belief "based upon his statements, his testimony and *his manner in testifying.*" (Emphasis added.)

■■■ The last finding is that the evidence clearly and convincingly demonstrated that the plaintiff caused a false transcript of courses purportedly taken at IUSM to be printed.

We first note that the charge upon which this finding was made was included in the notice to deny the application and, therefore, the finding itself was not a due process violation. We agree with the DPR that the finding was not against the manifest weight of the evidence. The identification by Dominguez was corroborated by the defendant's name on the transcript, the fact that the transcript was for IUSM, which the plaintiff did attend, and the fact that Las Cruces is a short distance from Juarez. A fact finder could also reasonably infer, as apparently the DPR did, that the plaintiff acquired the transcript.

---

[1]We note also that any finding of lack of moral character based on his applications at Rush-Presbyterian-St. Luke's Hospital and the ECFMG would also be a denial of due process since those were not included in the charges specified in the notice to deny his application.

██ The next question is whether the fact that the plaintiff did acquire the transcript, but never used it, may properly subject him to sanctions by the DPR. In support of its position the DPR cites *Cicmanec v. Department of Registration & Education* (1989), 182 Ill. App. 3d 710, 538 N.E.2d 1166. In that case the plaintiff was a licensed chiropractor in Illinois in 1978. He was also licensed to practice in California and did so between 1979 and 1982. In 1982 he applied for admission to a medical school in the Dominican Republic and was accepted. He paid $20,000 to the medical school for "tuition" between June 1982 and December 1982. Without attending any classes or doing any clinical work, the plaintiff received a medical diploma from the school. Before receiving the diploma he applied to take the ECFMG examination. On the application he falsely stated that he had attended the school from 1979 to 1983 and had graduated in 1983.

In January 1983 he took and failed the ECFMG examination. The following April he reapplied and repeated the false statements regarding his medical education. He failed the examination again and returned to his chiropractor practice in California.

Disciplinary proceedings were instituted in Illinois seeking revocation or suspension of his chiropractor license. He was charged with buying the license without having done anything to earn it and with making misrepresentations in his ECFMG applications. He was found guilty of the charges, and the circuit court affirmed the Department. The appellate court affirmed the circuit court, holding that the "mere fact that plaintiff has the medical diploma allows him the opportunity to display the diploma in his office, thereby suggesting to the public that he has professional capabilities beyond that of a chiropractor." *Cicmanec*, 182 Ill. App. 3d at 717.

The facts of *Cicmanec* are quite dissimilar to the facts in this case. It is difficult to conceive that a doctor would put medical school transcripts on his office wall. More important, the record in *Cicmanec* clearly shows that the applicant made material misrepresentations in order to take the ECFMG examination. He would not have been permitted to take the examination without some proof that he had graduated from a foreign medical school. In short, he used the bogus diploma. Most important, however, he conspired with, and bribed, officials of the foreign medical school.

It is appropriate to discuss the *Cicmanec* case in another context.[2] In *Cicmanec*, the applicant made material misrepresentations and *used* the false diploma; as noted, he conspired with, and bribed, individuals from a foreign medical school and paid them a substantial amount of money, $20,000. The sanction imposed against him was suspension of his license for two years with the requirement of 100 hours of continuing medical education followed by two years of probation. In contrast, the record in this case shows that Dr. Abrahamson has graduated from a recognized medical school; he has passed the ECFMG and the FLEX test; he has satisfactorily completed clinical training in surgery in three prestigious medical facilities, and unlike the plaintiff in *Cicmanec*, he never used the Dominguez transcript. And yet, the DPR imposed upon him the comparatively draconian sanction of a denial of his application. In our judgment, the severe impact of the sanction is not softened by granting him the right to reapply within two years. Thus, even if we were to accept all the arguments of the DPR, we would conclude that the sanction imposed upon Abrahamson was too severe. Under those circumstances, *Citrano v. Department of Registration & Education* (1980), 90 Ill. App. 3d 937, 414 N.E.2d 74, provides us with guidance. In that case, a barber's license was revoked because he made false statements in his application for a license and he conspired with another person to have that person take the examination in his stead. The circuit court held that the sanction of revocation was too severe, was arbitrary and capricious, and remanded the case to the Department of Registration and Education with instructions to impose a sanction of no more than three months. The Department appealed. The appellate court agreed with the circuit court that the revocation order was too severe and upheld the circuit court remandment order.

In the case before us, the plaintiff applied in June 1986, and his application was ultimately denied in March 1988. The circuit court reversed the DPR's denial, but we stayed the circuit court's order. The effect has been the equivalent of a four-year-and-eight-month suspen-

---

[2]The plaintiff has moved this court to take judicial notice of other disciplinary proceedings involving physicians and the sanctions imposed against them as disclosed in a medical magazine. He asks us to compare the sanctions imposed in those cases to illustrate the comparative harshness of the sanction imposed in this case. We agree with the DPR that we may not take judicial notice of those disciplinary matters disclosed in the medical periodical. We do, however, have the right to consider whether the sanction imposed is unduly severe. *Citrano v. Department of Registration & Education* (1980), 90 Ill. App. 3d 937, 414 N.E.2d 74.

sion of the plaintiff's license. He has been punished enough. Therefore, no purpose would be served by remanding this case for further proceedings to determine an appropriate sanction, even if we agreed with the arguments of the DPR.

For these reasons, the judgment of the circuit court is affirmed, and the order staying the effect of the circuit court order is vacated.

Judgment affirmed; order vacated.

McNAMARA and LaPORTA, JJ., concur.