**Louis DeSALLE, Plaintiff,**

v.

**Kevin K. WRIGHT; Jere E. Fridheim, M.D.; Arvind K. Goyal, M.D.; Lawrence L. Hirsch, M.D.; John M. Holland, M.D.; Roger A. Pope, D.C.; and Larry S. Patton, D.O.; Defendants.**

No. 90 C 6405.

United States District Court,
N.D. Illinois, E.D.

April 11, 1991.

Alan Rhine, Augustine & Kern, Ltd., Chicago, Ill., for plaintiff.

Kathleen Kreisel Flahaven, Asst. Atty. Gen. of Illinois, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Louis DeSalle ("DeSalle") sues Illinois Department of Professional Regulation ("Department") Director Kevin Wright ("Wright")[1] and the members of the Illinois Medical Licensing Board ("Board")—Jere Fridheim, M.D., Arvind Goyal, M.D., Lawrence Hirsch, M.D., John Holland, M.D., Roger Pope, D.C., and Larry Patton, D.O.—pursuant to 42 U.S.C. § 1983 ("Section 1983"), charging a violation of DeSalle's civil rights in denying his application for a license to practice medicine in Illinois. In Count I—brought against defendants in their official capacities—De-

Salle asserts that the Medical Practice Act of 1987 (the "Act," Ill.Rev.Stat. ch. 111, ¶¶ 4400–1 to 4400–63[2]) is unconstitutional as applied to him because it denies him equal protection of the laws. In Count II—brought against defendants in their individual capacities—DeSalle alleges that he was denied due process of law because he was deprived of meaningful notice and an opportunity to be heard. DeSalle seeks declaratory and injunctive relief as well as monetary damages.

Defendants now move to dismiss both counts pursuant to Fed.R.Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, defendants' motion is granted on both counts, and this action as well as DeSalle's Complaint are dismissed.[3]

### Facts[4]

DeSalle enrolled in and attended the University of Illinois School of Medicine ("U. of I.") from September 1972 through December 1977. DeSalle successfully completed all of the U. of I. course work including core rotations,[5] but he did not graduate[6] (I ¶ 7). DeSalle later enrolled in Spar-

1. Nikki Zollar has succeeded Wright as Department's Director and would thus automatically succeed him as defendant to DeSalle's official-capacity claims under Fed.R.Civ.P. 25(d)(1). That formal succession becomes moot because of the decision reached here.

2. All relevant sections of the Act will be cited simply as "Act § —," omitting the "4400–" part of the statutory paragraph number.

3. Count III, asserting a state law claim, has previously been dismissed for lack of subject matter jurisdiction.

4. Under Rule 12(b)(6) this Court must accept as true all well-pleaded factual allegations, drawing all reasonable inferences in DeSalle's favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). This opinion's factual statement conforms to that requirement, citing to allegations of the Complaint in the form "I ¶—" for allegations in Count I and "II ¶—" for allegations in Count II. As for the legal standard employed here, this opinion applies the established principle that a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2233–34, 81 L.Ed.2d 59

(1984), citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

5. Core rotations are clinical training rather than basic science courses. Students rotate through hospital departments in five subjects, and by rule those core rotations must be between 4 and 12 weeks (see 68 Ill.Ad.Code §§ 1285.20(d) & (h)).

6. DeSalle does not explain why, if he completed all required course work at U. of I., he did not graduate and then seek a temporary license, for which he presumably would have been eligible under the Act (see Act § 11(A)(2)(a)(ii), described later in this opinion). However, a possible clue to resolution of that mystery is provided by *Craft v. Board of Trustees of the University of Illinois*, 516 F.Supp. 1317 (N.D.Ill.1981), an opinion in which then District Court Judge Joel Flaum discussed a multitude of allegations by Willie Warren Craft and this case's plaintiff DeSalle (both black medical students) (1) that they had met all requirements for graduation except passing the senior certifying examination and (2) that they had not passed that examination because the defendants there had failed to provide them with a remedial program as well as other services and benefits—a race-based denial—in violation of the Constitution.

tan Health Sciences University ("Spartan"), a foreign medical school that gave DeSalle credit for his studies at U. of I. (I ¶ 8).[7] Spartan required DeSalle to do additional clinical training for a period of 44 weeks before awarding him the degree of Doctor of Medicine (I ¶ 9).

Sometime before June 15, 1990 [8] DeSalle applied for a temporary license to do postgraduate residency training scheduled to commence on July 1 at Cook County Hospital (II ¶ 4). Although DeSalle filed an official transcript from U. of I. with his application, Department wrote DeSalle on July 18 requesting that he supply a detailed explanation of the exact courses for which he had received credit (II ¶ 10). Department requested that DeSalle attend an interview to be conducted by Board on September 12, but it did not advise DeSalle of the precise issues to be raised at the interview (II ¶ 23).

Following the interview, Board voted to recommend denial of the license to DeSalle (II ¶ 14). Wright adopted that recommendation without further evidentiary hearing (II ¶ 15). As a result, DeSalle was unable to start his residency position at Cook County Hospital and became unlikely to secure another residency for that academic year (II ¶ 16).

### Equal Protection Clause

■ DeSalle's equal protection claim targets Act § 11(A)(2)(a)(i)—ostensibly the section that caused defendants to deny his license (see I ¶ 17). However, his challenge to the section's constitutionality does not withstand analysis.

In general, Act § 11 sets out the minimum standards of professional education that an applicant must meet as one of the Act's requirements for temporary licensure

(see Act § 17(C)). In particular, Act § 11(A)(2)(a)(i) (emphasis added) requires:

> that the applicant ... graduated from a medical or osteopathic college officially recognized by the jurisdiction in which it is located for the purpose of receiving a license to practice medicine in all of its branches, and the applicant has completed, as defined by the Department, a 6 year postsecondary course of study comprising at least 2 academic years of study in the basic medical sciences; and *2 academic years of study in the clinical sciences, while enrolled in the medical college which conferred the degree, the core rotations of which must have been completed in clinical teaching facilities owned, operated or formally affiliated with the medical college which conferred the degree,* or under contract in teaching facilities owned, operated or affiliated with another medical college which is officially recognized by the jurisdiction in which the medical school which conferred the degree is located....

To meet those terms, DeSalle would have been required to have completed his core rotations at Spartan, the medical school that conferred his medical degree, rather than at U. of I. (it does not matter that Spartan accepted a transfer of credits from U. of I.).[9] DeSalle does not disagree that he is ineligible for a temporary license under the straightforward terms of Act § 11(A)(2)(a)(i).[10]

DeSalle's claim that the Act violated his right to equal protection requires an understanding of how the Act classifies applicants according to their education. Three statutory classifications are involved:

1. those applicants who graduated from unaccredited medical colleges re-

---

**7.** DeSalle's Complaint does not set out the location of Spartan or the dates that he attended there.

**8.** All dates cited without a year designation also refer to 1990.

**9.** DeSalle does not contend that the 44 weeks of clinical rotations at Spartan fulfilled his core rotation requirement.

**10.** Nor does DeSalle claim that he has met the requirements of either Act § 11(A)(2)(a)(ii) or § 11(A)(2)(b), the other two possible methods for satisfying the minimum educational standard requirement for temporary licensure. Those two methods will be described in the next paragraph of the text.

gardless of their location (Act § 11(A)(2)(a)(i));

2. those who graduated from accredited medical colleges (Act § 11(A)(2)(a)(ii)) [11]; and

3. those who completed the requirements (except for internship, social service and degree) of medical colleges located outside of the United States and Canada and then applied to, were evaluated by and completed one academic year of supervised clinical training under the direction of an accredited medical college (Act § 11(A)(2)(b)).[12]

Because those classifications do not involve a fundamental right or a suspect classification, under an equal protection analysis this Court must "presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest" (*Sutker v. Illinois State Dental Society*, 808 F.2d 632, 634 (7th Cir.1986), quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam)). In upholding an Illinois dental licensing statute against an equal protection challenge, *Sutker* elaborated (808 F.2d at 635, quoting *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955)):

The Supreme Court has consistently held that, when matters of health and safety are concerned, great judicial deference is owed to the legislative judgment. Indeed, the "law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

This Court may not set aside the statutory classifications at issue here "if any state of facts reasonably may be conceived to justify [them]" (*McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)).[13]

In an effort to demonstrate the statute's irrationality, DeSalle argues primarily that Act § 11(A)(2)(a)(i) discriminates against graduates of unaccredited foreign medical schools (other than Canadian medical schools) by not allowing them to transfer credits from other schools to fulfill the core rotation requirements. Act §§ 11(A)(2)(a)(ii) and 11(A)(2)(b), on the other hand, do not appear to proscribe the transfer of credits from one medical college to another. DeSalle would have been eligible for temporary licensure if he had done all of his course work either at U. of I. (under Section 11(A)(2)(a)(ii)) or at Spartan (under Section 11(A)(2)(a)(i)).

DeSalle maintains that the statute's treatment of his situation was arbitrary in relation to either of two conceivable government objectives. First, to the extent that the Act might reflect a legislative concern that foreign or unaccredited medical schools provide an inferior education, he argues that it makes no sense that he could have been qualified for temporary licensure under Act § 11(A)(2)(a)(i) if he had done all of his course work at Spartan—for he says

---

**11.** More specifically Act § 11(A)(2)(a)(ii) requires:

that the applicant ... graduated from a medical or osteopathic college accredited by Liaison Committee on Medical Education, the Committee on Accreditation of Canadian Medical Schools in conjunction with the Liaison Committee on Medical Education, or the American Osteophathic Bureau on Professional Education....

**12.** More specifically Act § 11(A)(2)(b) requires: that the applicant has studied medicine at a medical or osteopathic college located outside the United States, its territories, or Canada, that the applicant, in addition to satisfying the requirement of subparagraph (a), except for the awarding of a degree, has completed all of

the formal requirement of a foreign medical school except internship and social service and has submitted an application to a medical college accredited by the Liaison Committee on Medical Education and submitted to such evaluation procedures, including use of nationally recognized medical student tests or tests devised by the individual medical college, and that the applicant has satisfactorily completed one academic year of supervised clinical training under the direction of such medical college....

**13.** DeSalle is simply wrong in asserting, based on a misreading of *Sutker*, that some evidential inquiry is required.

the state's interest would be better served by an applicant doing as much of his or her training as possible at U. of I. Second, to the extent that Act § 11(A)(2)(a)(i) could be explained as serving the legislature's desire for continuity in education, he complains that explanation is irrational because the other two subsections, most notably Act § 11(A)(2)(b), allow for the transfer of credits.

Whatever degree of persuasiveness those arguments might arguably have in terms of DeSalle's personal situation, *Whitfield v. Illinois Board of Law Examiners*, 504 F.2d 474, 476 (7th Cir.1974) (per curiam) (citations omitted) explains that is not enough:

> It is well settled that the question of whether a classification passes constitutional muster cannot be answered simply by assessing its chance effect upon a particular individual.

What is called for instead is an analysis of the aims and methods of the statute as a whole.

As for the statute's aim, it unquestionably passes muster—in order to protect the public, a state has a legitimate interest in the quality of physicians that it licenses (*Dent v. West Virginia*, 129 U.S. 114, 122–28, 9 S.Ct. 231, 233–35, 32 L.Ed. 623 (1889); *Sutker*, 808 F.2d at 636). Accreditation of schools is one way to ensure the quality of education received by the applicant.[14] As for the foreign medical school, the Illinois Supreme Court has recognized in *Rios v. Jones*, 63 Ill.2d 488, 497, 348 N.E.2d 825, 830 (1976):

> We believe that it is reasonable to impose strict licensing requirements upon physicians who received their medical training in foreign countries. The medical edu-

cation received by the plaintiffs may be inferior to, superior to or comparable to medical education available in the United States. The fact is, however, that our General Assembly cannot be expected to be a judge of the quality of foreign medical training facilities.

It must be underscored that satisfaction of one of the three Act § 11(A)(2) alternatives does not qualify the applicant for the practice of medicine as such—rather the applicant must then enter 24 months of further clinical training *in Illinois* under approved conditions.[15] Hence it is entirely rational for the legislature also to have chosen one or more routes different from accreditation in qualifying a graduate of such a foreign school for such *temporary* licensure.

In this instance two such possible routes have been selected:

1. Under Act § 11(A)(2)(a)(i), such an applicant can qualify if the jurisdiction in which he or she will practice officially recognizes the school and the applicant's education was continuous within the same school *or* within a school under contract with that school and recognized by the jurisdiction.

2. Under Act § 11(A)(2)(b) (known colloquially as the "fifth pathway"), the applicant who completed substantially all of his or her study at a foreign school may qualify if the applicant is evaluated by an accredited medical college and is approved for and completes one academic year of supervised clinical training under the direction of that college.

Both those methods offer reasonable restrictions on the temporary licensure of such graduates to gain a ticket of entry to further Illinois-supervised training—the former by using continuity of education[16]

14. Accreditation by private committees is a valid method by which a state may choose to measure educational quality. Thus rules that preclude the licensure as *lawyers* of graduates who attended law schools not approved by the American Bar Association have been upheld (see, e.g., *Nordgren v. Hafter*, 789 F.2d 334 (5th Cir.1986) (per curiam)).

15. Temporary licensure under the Act enables the applicant to enter a postgraduate residency in an approved Illinois hospital. Thus the statu-

tory scheme does not involve any ultimate delegation of licensing authority to an entity—the unaccredited foreign medical school—over which there is no exercise of quality control (a situation that might have difficulty in passing a rational classification test).

16. Although this Court need not parse the rationality test to the nth degree, possible reasons for requiring continuity include such things as preventing the transfer of unsuccessful medical students to unaccredited foreign schools.

as well as acceptance by the other jurisdiction as an assurance of quality, and the latter by using acceptance by an accredited program as such an assurance. This Court cannot say that such a scheme is irrational—as stated in *Illinois Psychological Association v. Falk*, 818 F.2d 1337, 1341 (7th Cir.1987) (citation omitted):

> The federal courts long ago, and whether rightly or wrongly, got out of the business of second-guessing state decisions on occupational licensure.

Besides the opportunity that DeSalle had after his unsuccessful completion at U. of I. to qualify for licensure by attending an accredited school (under Act § 11(A)(2)(a)(ii)), he had two other opportunities to qualify for licensure in Illinois given his attendance at an unaccredited foreign school such as Spartan. Although this Court will not engage in speculation as to Spartan's reputation or reliability, DeSalle's failure to qualify under Act § 11(A)(2)(a)(i) or to avail himself of the opportunity under Act § 11(A)(2)(b) attests more to the statute's achievement of purpose through its classifications to ensure quality of education than to any asserted arbitrariness. In any case, it is immaterial that a statute may have arbitrary consequences in an isolated circumstance when it is rational as a whole. This Court finds Act § 11(A)(2)(a)(i) constitutional as a matter of law.

### Due Process Clause

■ DeSalle next contends that the lack of notice as to the precise issues to be raised by Board in his interview, thus assertedly rendering him unable to address those issues, deprived him of due process of law.[17] But on that claim he trips and falls over the very threshold, never reaching a right to consideration of the possible merits of his argument.

It is well settled that to establish a due process violation, DeSalle must show *two* things (*Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675–76 (7th Cir. 1987), quoting *Cunningham v. Adams*, 808 F.2d 815, 820 (11th Cir.1987)):

> (1) a protected property or liberty interest, and (2) that [he] was deprived of that interest by government action and without due process of law.

DeSalle must first demonstrate, then, that defendants deprived him of a protected property or liberty interest. To be sure, pursuit of a profession (including that of a physician) is indeed such an interest (*Becker v. Illinois Real Estate Administration & Disciplinary Board*, 884 F.2d 955, 957 (7th Cir.1989)), but as *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) has emphasized:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Because DeSalle does not qualify for a temporary license under a straightforward application of the terms of the Act, he has no legitimate claim of entitlement to it. It is therefore needless to reach the issue of what kind of process was assertedly due him in Board's interview.[18] Here Board was entitled to refuse his application based

---

17. It is worth noting (though not a necessary factor in this Court's decision under the circumstances) that DeSalle does not state what those issues were. In addition, defendants point out that DeSalle had a right under Act § 41 to seek administrative review of the denial of his application (Ill.Rev.Stat. ch. 110, ¶¶ 3–110, –111(a)(6) & (7)) but he did not pursue that right.

18. Nor does this Court need to reach defendants' claim of qualified immunity as to Count II. All the same, DeSalle would seem to have had an insurmountable task in obtaining damages (though perhaps not injunctive relief) on that claim—in demonstrating that defendants had violated a "clearly established" constitutional right in the terms defined by *Anderson v.*

upon statutory grounds alone, and his failure to meet the factual objective standards for temporary licensure is uncontroverted. It is thus irrelevant to that determination whether or not he received an interview—as distinguished from the need for an interview where Board may be making a subjective determination, such as whether the applicant meets the Act's requirement of good moral character (see, e.g., *Abrahamson v. Illinois Department of Professional Regulation*, 210 Ill.App.3d 354, 154 Ill. Dec. 870, 879–80, 568 N.E.2d 1319, 1328–29 (1st Dist.1991); *Becker*, 884 F.2d at 958–59 [19]). Therefore this Court also finds as a matter of law that DeSalle was not denied the due process of law.

## Conclusion

There is no set of facts consistent with DeSalle's allegations that would entitle him to relief on either count, nor (given the reasons for that conclusion) could he be assisted by an opportunity to replead. Defendants' motion to dismiss is granted. Not only his Complaint but also this action itself are dismissed in their entirety.

*Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

19. Nor does the statute vest Board with discretion to grant a waiver of the objective statutory standard, another situation in which the due process requirements of a hearing would come into play.